IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

   v.

DUSTIN WARD,

     Defendant.

CRIMINAL ACTION FILE

NO. 4:15-CR-00020-HLM-WEJ-1

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Dustin Ward's "Motion to Suppress Evidence Seized from Automobile and Custodial Statements" [10] and "Motion to Suppress Evidence Obtained by Search Warrant Not Supported by Probable Cause and Prompted by the Unlawful Stop and Search of an Automobile" [11].  On September 25, 2015, the Court conducted an evidentiary hearing [34] regarding these Motions, which was continued on January 29, 2016 [48].  Both hearings have been transcribed [38], [49] (hereafter "Tr.").  The parties have also briefed the issues raised.  (See Def.'s Br [54]; Gov't Prelim. Resp. [28]; Gov't Resp. [56].)  For the reasons explained below, the undersigned **RECOMMENDS** that both Motions be **DENIED.**

I.  **STATEMENT OF FACTS**

A.  **Mr. Ward's Criminal History**

Mr. Ward was convicted of forgery on October 4, 2011, in the Superior Court of Polk County, Georgia,[1] following a jury trial where he was represented by counsel.  (Gov't Ex. 1; Tr. 11.)  This conviction resulted in a sentence of confinement for five years, the final three of which could be served on probation. (Gov't Ex. 1; Tr. 7, 11.)  On the date of his conviction, defendant agreed to conditions of probation that would apply during the final three years of the sentence. (Gov't Exs. 1 & 2; Tr. 12-15.)  Two of the relevant conditions specified that Mr. Ward would agree to allow his probation officer to visit him at home, and would submit to unscheduled drug testing.  (Gov't Exs. 1 & 2; Tr. 13-15.)

B.  **Mr. Ward's Probation**

While on probation, defendant was supervised by the Cedartown Department of Community Supervision, Tallapoosa Circuit ("Probation Office"). (Gov't Exs. 1 & 2.)  Mr. Ward was under the direct supervision of Probation Officer Joran Bell from December 9, 2013 to August 11, 2014.  (Tr. 9, 42, 51-52.) Chief Probation Officer James Scot Dean supervised Probation Officer Bell.  (Id.

---

[1] Defendant's case number was 2011CR-1765.  (See Gov't Ex. 1.)

2

at 42, 138-39.)   The Probation Office considered Mr. Ward "high risk," and he was difficult to deal with throughout his probation.  (Id. at 42, 172.)  Defendant violated the conditions of his probation on multiple occasions and, in August 2013, additional special conditions were added to his original sentence.  (Gov't Ex. 3; Tr. 16-17.)   In April 2014, defendant was sentenced to sixty days of custody in the Probation Detention Center, through July 20, 2014, for failing a drug screen.  (Gov't Ex. 3; Tr. 16-17.)  As of August 2014, Mr. Ward was still subject to the terms of his 2011 probation agreement and the additional special conditions added in 2013.  (Tr. 9, 17, 42.)

### C.   Probation Office Receives Information

In April 2014, the Probation Office was made aware of information regarding defendant's behavior.  Specifically, Probation Officer Philip Payton testified that the Probation Office learned that Mr. Ward was a person of interest in a murder case; that he was referred to as "the most dangerous probationer we had on our books"; that Probation Officer Blake Cauthen had been told by other agents that Mr. Ward had a plan to hurt law enforcement by blowing up a bridge near his home; that he was out on bond for kidnapping and aggravated assault; that he was on a gang list related to the Aryan Outlaws; and that he "didn't care for" Probation Officer Cauthen.  (Def.'s Ex. 4; Tr. 159, 161-62.)

3

On August 8, 2014, shortly after Mr. Ward was released from custody in the Probation Detention Center, the Probation Office received additional information regarding dangerous and illegal activity by Mr. Ward. (Gov't Ex. 4; Def.'s. Exs. 10 & 12; Tr. 17-19.)   On that date, a female probationer told Probation Officers Bell and Payton that Mr. Ward kidnapped her and a friend at gunpoint, and threatened to kill them. (Def.'s. Exs. 10 & 12; Tr. 44-45, 144, 164).[2]   Probation Officer Payton, who was the Probation Office's Security Threat Group Coordinator, noted this information, along with the information the Probation Office learned in April 2014, within SCRIBE, the internal probation department computer database, and forwarded the information through GISAC, an intelligence sharing device. (Def.'s. Ex. 10; Tr. 140-43, 165-68, 170-73.)   The SCRIBE entry noted that the source of the information about the kidnapping was considered "unreliable." (Tr. 168.)   Probation Officer Bell noted in his SCRIBE report that he personally advised the female probationer that he would try to catch

_____

[2] At the time, the women called 911, but refused to file a police report. (Tr. 71, 78-79, 103.)   However, following Mr. Ward's arrest on August 11, 2014, discussed infra, one of the two women filed a report with the PCPD on August 15, 2014 regarding the kidnapping. (See Gov't Resp. n.1.)

Mr. Ward with a gun and drugs without letting him know she was the source of the information. (Def.'s Ex. 12; Tr. 72-73, 181.)

On the morning of August 11, 2014, Probation Officer Cauthen learned from Michael Lynch, an officer with the Polk County Police Department ("PCPD"), that Mr. Ward had been detained by a PCPD officer for behaving "erratically and potentially violently" and attacking his mother on the evening of August 10, 2014. (Gov't Ex. 4; Tr. 19, 36-38.) The attack did not involve a firearm, and Mr. Ward was not arrested. (Tr. 36-38, 78-79.) Officer Lynch advised Probation Officer Cauthen that it would be "unwise" for the Probation Office to pay a field visit to defendant with less than two officers present, due to defendant's unstable behavior. (Gov't Ex. 4.) Probation Officer Cauthen sent an email to the entire staff of the Tallapoosa Judicial Circuit, every probation officer in Cedartown and Haralson County, surveillance officers, and administrative assistants regarding this information, for purposes of officer safety. (Gov't Ex. 4; Tr. 18-21, 36, 39, 78-79, 98, 144.) Probation Officer Payton forwarded Probation Officer Cauthen's August 11, 2014, email to GISAC and to Sergeant Wayne Lloyd with the PCPD. (Gov't Ex. 4; Tr. 79, 98.)

### D.   Law Enforcement Meets to Discuss Defendant

After receiving the GISAC report on August 11, 2014, Special Agent Micah Childers of the Federal Bureau of Investigation ("FBI"), head of the Safe Streets Task Force, contacted Probation Officer Payton and asked if he and the probation officers wanted to meet with local law enforcement to discuss Mr. Ward.  (Tr. 100, 146, 168-69, 173-75, 204, 207-08.)  Agent Childers testified that the officers agreed to set up the meeting due to the potential threat to law enforcement.  (Id. at 205.)  Probation Officer Payton agreed to meet and he invited Probation Officer Cauthen to join them.  (Id. at 25.)

The record is unclear as to how, when, and by whom the remainder of the involved parties were notified of and invited to the August 11 meeting.  (See Tr. 24-26, 56, 80, 99-100, 145-46, 174.)  However, it is clear that multiple agents from the FBI, the Georgia Bureau of Investigation ("GBI"), the PCPD and the Probation Office met at the PCPD office on August 11, 2014 to discuss Mr. Ward. (Id. at 107, 173-74, 183-84.)  Present at the meeting were:  FBI Special Agents Childers and Ajay Singh, Sgt. Lloyd, Probation Officers Cauthen, Payton and Bell, Chief Probation Officer Dean, and at least one GBI agent.  (Id. at 20-21, 25, 43, 45-46, 56-57, 76, 79-80, 98-100, 107, 208.)   The officers discussed the

6

August 11 email and shared information about Mr. Ward for sixty to ninety minutes.  (Id. at 21, 25-26, 57, 78-80, 99, 146-47, 174, 177.)

At the meeting, no particular person took the lead; instead, the officers engaged in a group discussion.  (Tr.  26, 100, 146, 184, 209, 212.)  The Probation Office provided "as much of [defendant's] criminal history as we could," including defendant's "history of erratic behavior," for purposes of officer safety.  (Id. at 21.)  The officers also discussed the kidnapping allegations,[3] as well as the April 2014 allegations that defendant was a murder suspect, in a gang, involved in narcotics trade, had attacked his mother, potentially had access to explosives, and had threatened to blow up a bridge.  (Id. at 33, 36-37, 39-40, 44-45, 80-82, 100-02, 189, 209-10, 212.)

### E.   Officers Visit Defendant's Residence

Because Mr. Ward was categorized as "high risk," the Probation Office was required to engage in two face-to-face interactions (including at least one home/field visit) with him each month, along with one "collateral contact" (i.e., a roommate or boss).  (Tr. 8, 33-34, 42-43, 46, 55, 163-64.)  Officer Bell testified

---

[3] Sgt. Lloyd testified that officers discussed two alleged kidnappings:  the one involving the two women described supra, and an additional kidnapping that occurred in a different jurisdiction.  (Tr. 81, 102.)

that because he had not yet had a field visit with Mr. Ward in August, after hearing the "complaints" at the meeting, he wanted to conduct a field visit with Mr. Ward that day.  (Id. at 44.)  To ensure officer safety, and because of the information shared at the meeting, the other officers accompanied the probation officers on the field visit.  (Def.'s Exs. 1 & 15; Tr. 21-22, 24, 30, 44, 55, 82-83, 147, 186, 199, 105-06, 213.)

Ten agents left the meeting together and proceeded to Mr. Ward's residence.  (Tr. 22-24, 43-44, 46-47, 77, 83, 106-07.)[4]  Sgt. Lloyd called to verify that Mr. Ward was home.  (Def.'s Ex. 15; Tr. 83-84,132.)  Because they knew where defendant lived, Probation Officers Bell and Payton were in the lead car.  (Tr. 31, 46-48, 58, 84, 107, 192.)  The other officers arrived in three to five vehicles behind the lead car, and were armed and wore identifying clothing.  (Id. at 27, 47-48, 64-65, 84-85, 108-09, 131-32, 215.)

Once the officers arrived at Mr. Ward's residence, Probation Officers Bell and Payton pulled into the driveway and parked behind a silver car that was in front of the mobile home.  (Tr. 46-48, 68, 84-86.)  Probation Officer Bell testified

––––––––––––––––––––

[4] Defendant's residence was located at 106 Formby Trail, Aragon, Georgia 30104.  (Gov't Ex. 5.)

that it was his impression upon their arrival that defendant was leaving in the car. (Id. at 68.)  Sgt. Lloyd testified that the car was on and running when the officers arrived, and that Mr. Ward had told him he was leaving to visit his father in the ICU.  (Def.'s Ex. 15; Tr. 110, 115.)  Officer Payton testified that he could tell that Mr. Ward's car was running when they arrived because he could hear the motor running and saw the taillights on.  (Id. at 192-93.)

Probation Officers Bell and Payton approached the silver car on foot.  (Tr. 49, 61.)  They asked Mr. Ward, who was sitting in the driver's seat, to step out of the car to speak with them, which Mr. Ward did.  (Id. at 47-49, 61-65, 110, 193, 216.)  Additionally, Probation Officer Payton asked defendant if he could perform a pat-down search on him, and defendant agreed.  (Id. at 194.)  In the back passenger side of the car was a male, later identified as Tommy Gates.  (Id. at 47, 59-60, 63, 85-86, 110-12, 115, 192-93, 216.)  Additionally, a female, later identified as Ashley Meeks, was in, or in the process of exiting, the car.[5]  (Id.)  While the Probation Officers spoke with Mr. Ward, Sgt. Lloyd, Agent Childers,

_____

[5] The record is unclear whether Ms. Meeks was in the car, exiting the car, or outside the car at the time the officers arrived, but all agree on her presence at the scene.  (See Tr. 47, 59-60, 63, 85-86, 111-12, 192-93, 216.)

9

and one more agent from the PCPD approached the passenger side of the car on foot. (Id. at 61, 86, 109, 113, 118.) Ms. Meeks and Mr. Gates exited the car and were separated from each other, the car, and Mr. Ward for purposes of officer safety. (Id. at 86-87, 111, 113, 117-18, 193.)

### F.  Officers Locate a Firearm

After Mr. Ward, Ms. Meeks, and Mr. Gates were outside of the car, Sgt. Lloyd, who was standing about a foot away from the car's running board on the passenger side, looked into the front driver seat floorboard area and "barely saw" the butt of a gun sticking up. (Gov't Ex. 9; Def.'s Ex. 6; Tr. 87, 119-21.) He testified that he may have bent down slightly to see the gun, but that it was otherwise in plain view; he testified that he did not enter any part of, or lean into, the vehicle to see the gun. (Tr. 61-62, 87, 119-21.) Sgt. Lloyd indicated to the other officers that he had seen a firearm and immediately requested that Mr. Ward be taken into custody. (Id. at 49-50, 61-62, 66-67, 87, 112-13, 119, 124-25, 194, 198-99.) Sgt. Lloyd testified that he took this precaution because the front driver's side door was open and Mr. Ward, who was still nearby with the Probation Officers, could "easily be able to lunge in and get the gun . . . " (Id. at 87, 125.)

10

After Mr. Ward was handcuffed, Sgt. Lloyd walked around to the driver's side of the car, looked down into the front floorboard, and verified that what he had seen was actually the butt of a gun.  (Gov't Exs. 10 & 11; Def.'s Exs. 4 & 5; Tr. 87, 124.)  While none of the other officers saw the firearm initially, Probation Officer Payton looked into the car after Sgt. Lloyd confirmed its presence and also saw the firearm.  (Tr. 29-30, 61, 65, 67, 71, 194, 200.)

### G.   Offices Arrest Mr. Ward

Sgt. Lloyd testified that he read Mr. Ward his <u>Miranda</u> rights after he was handcuffed.  (Gov't Ex. 7; Tr. 88-90, 126.)  Probation Officers Bell and Payton testified that they did not have their guns drawn throughout the encounter with defendant.  (Tr. 64-65, 110.)  Mr. Ward then agreed to speak with Sgt. Lloyd, and told him the gun was not his.  (<u>Id.</u> at 90-91.)  Probation Officers Bell and Payton then stood by with defendant until he was transported to jail.  (<u>Id.</u> at 50, 67.) Officer Bell asked defendant to submit to a urine screen, which he refused.  (<u>Id.</u>) Sgt. Lloyd seized the gun.  (<u>Id.</u> at 93, 124-25.)

### H.  Officers Obtain a Search Warrant

Meanwhile, based on Sgt. Lloyd's observation of the firearm, officers sought a search warrant for Mr. Ward's home and car.  (Def.'s. Exs. 1, 2, 9 & 12; Tr. 91-92, 95, 127-28.)   They based this warrant upon an affidavit stating that

defendant possessed firearms, magazines, ammunition, and holsters in violation

of O.C.G.A. § 16-11-131 (possession of a firearm by convicted felon).  (Def.'s Ex.

1.)  The affidavit, prepared by PCPD Agent Torey Wright, states the following:

> On August 11, 2014, at approximately 04:30 pm, Agents with the
> Polk County Drug Task Force assisted members of the Georgia
> Department of Corrections in locating Mr. Dustin McClain Ward at
> 106 Formby Trail, Aragon, Polk County, Georgia. Georgia
> Department of Corrections Officers were in search of Ward to
> retrieve an [sic] urine analysis sample. Ward was located inside a
> silver 2003 Ford Focus, Georgia tag number PJU2705, sitting in the
> drivers [sic] seat, with the vehicle's engine running in the driveway
> of the residence. Also inside the vehicle was a Ms. Ashley Meeks
> sitting in the front passenger seat and Mr. Thomas Gates in the back
> seat of the vehicle. Georgia Department of Corrections Officers
> made contact with Ward at which time he was asked to exit the
> vehicle and did so. Agents with the Polk County Drug task force
> made contact with Meeks and Gates and also asked them to exit the
> vehicle at which time they did so. Located inside the vehicle in the
> drivers [sic] side floor board next to the gear shifter observed to be a
> black handgun in plain view. At that time Ward was placed under
> arrest knowing that he is a convicted felon and is in possession of a
> firearm. The firearm was retrieved and found with a loaded
> magazine with one round in the chamber. At this time Agent Lloyd
> read Ward his Miranda warning at which time Ward waived his
> rights. After checking all subjects through the Polk County Sheriff's
> Department Agents were advised that Meeks had an active warrant
> through Polk County for failure to appear. Agent Lloyd read Meeks
> her Miranda warning at which time she waived her rights also.
> Meeks advised just prior to our arrival Ward had exited the residence.
> While Agents were speaking to Ward, Ward was insistant [sic] about
> locking up his 1973 Plymouth Valiant.

(Def.'s Ex. 1, at 3-4.)  A Polk County magistrate judge issued a warrant, which

the officers executed that same day.  (Def.'s. Exs. 1, 2, 9 & 12; Tr. 72, 128.)

During their search, officers located two additional firearms, associated ammunition, a digital pocket scale with methamphetamine residue, and a pair of brass knuckles. (Def.'s Exs. 1, 2, & 3.)

## II.    THE INDICTMENT

On July 8, 2015, a grand jury in the Northern District of Georgia returned a one-count Indictment [1] against defendant. Count One alleges that, on or about August 11, 2014, in the Northern District of Georgia, defendant Ward, having been convicted of a crime punishable by imprisonment for a term exceeding one year (i.e., forgery), did knowingly possess in and affecting interstate and foreign commerce, at least one of the following: two firearms, that is, a Highpoint Model 9C, 9mm firearm; a Jennings Model 48, .380 Semi-Automatic firearm; and associated ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). The Indictment also contains a forfeiture provision.

## III.    ANALYSIS

Through his two motions, Mr. Ward challenges the stop and search of his car and home, his arrest, custodial statements, and the seizure of evidence pursuant to a warrant sought based on information obtained during those searches. Specifically, he contends that the officers entered his property under the pretext of a probation visit, when their actual motivation was finding him with a gun or with

13

other evidence of criminal activity based on the information shared at the August 11 meeting.  He further argues that the observations made by Sgt. Lloyd and placed in the affidavit supporting the search warrant application omitted material facts and were made in violation of the Fourth Amendment, and thus contends that the evidence seized under the warrant should be suppressed.  He also separately challenges the validity of the warrant under Franks v. Delaware, 438 U.S. 154 (1978), and seeks suppression of his custodial statements under the Fourth and Fifth Amendments.

### A.   Defendant's Motion to Suppress Evidence Seized from Automobile and Custodial Statements

In the Motion to Suppress Evidence Seized from Automobile and Custodial Statements [10], defendant argues that the stop and search of his car, seizure of the gun, and his arrest violated the Fourth Amendment, and that the gun found in the car should therefore be suppressed.  (Def.'s Mot. Suppress Evid. [10] ¶ 12; Def.'s Br. 7-15.)   Additionally, defendant argues for the suppression of all statements made during custodial interrogation because the Government has not shown that those statements were made voluntarily and that they comported with the requirements of Miranda v. Arizona, 396 U.S. 868 (1969).  (Def.'s Mot. Suppress Evid. [10] ¶¶ 13-14.)   He also argues that the statements must be suppressed as "fruit of the poisonous tree" stemming from the alleged earlier

14

Fourth Amendment violations.  (Id.)  The Government notes that Mr. Ward's probation had conditions of visitation, and argues that Mr. Ward's arrest and the seizure of the firearm were proper because Sgt. Lloyd saw the gun in plain view. (Gov't Resp. 9-11.)

### 1.    The Seizure and Arrest Were Proper

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  A search conducted without a warrant issued upon probable cause is "per se unreasonable [under the Fourth and Fourteenth Amendments]. . . subject only to a few specifically established and well-delineated exceptions."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) and Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)).  However, while "[t]he Fourth Amendment's protection against unreasonable searches and seizures unquestionably applies to probationers," United States v. Wasser, 586 F. App'x 501, 504 (11th Cir. 2014) (per curiam) (citing Owens v. Kelly, 681 F.2d 1362, 1367 (11th Cir. 1982)), probationers have a diminished expectation of privacy. See Owens, 681 F.2d 1367; see also United States v. Knights, 534 U.S. 112, 119

(2001). Thus, "[a] court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens," Knights, 534 U.S. at 119, such as the home visitation provision Mr. Ward agreed to here. See, e.g., United States v. Carter, 556 F.3d 970, 975 (11th Cir. 2009) (per curiam).

Moreover, although privacy in the interior of a home and its curtilage are at the core of what the Fourth Amendment protects, there is no reasonable expectation that a home and its curtilage will be free from ordinary visual surveillance. See California v. Ciraolo, 476 U.S. 207, 213 (1986). "When a law enforcement officer who has a right to be where he is simply observes that which is in his plain view, there is no illegal search." United States v. McKlemurry, 461 F.2d 651, 653 (5th Cir. 1972) (per curiam).[6] The rationale for the plain-view doctrine is as follows:

> [I]f contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment – or at least no search independent of the initial intrusion that gave the officers their

-------------------

[6] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

> vantage point . . . The warrantless seizure of contraband that presents
> itself in this manner is deemed justified by the realization that resort
> to a neutral magistrate under such circumstances would often be
> impracticable and would do little to promote the objectives of the
> Fourth Amendment.

Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (internal citations omitted).

Agents may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are met: "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and, (2) the incriminating character of the item is immediately apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006) (citing Horton v. California, 496 U.S. 128, 136-37 (1990); see also Rodgers, 924 F.2d at 221 (citing G.M. Leasing Corp. v. United States, 429 U.S. 338, 354 (1977) ("The plain view doctrine allows police officers to seize any contraband in plain view if the officers have a right to access to the place where the contraband is located.")). The officer must have probable cause to believe that the object in plain view is contraband or evidence. See Texas v. Brown, 460 U.S. 730, 741 (1983); Smith, 459 F.3d at 1290. The phrase "immediately apparent" does not require "a police officer 'know' that certain items are contraband or evidence of a crime." Brown, 460 U.S. at 741. Instead, probable cause requires only that the "facts available to the officer would 'warrant a man

17

of reasonable caution in the belief,' . . . that certain items may be contraband . . . or useful as evidence of a crime; it does not demand any showing that such a belief be correct." Id. at 742 (internal citation omitted).

Mr. Ward challenges the search of his vehicle under the Fourth Amendment, and argues that the officers lacked probable cause, or even reasonable suspicion, to search his car. (See Def.'s Br. 7-15.) This argument is unavailing. The officers had lawful access to Mr. Ward's driveway area near his car because they were conducting a lawful home visit. Sgt. Lloyd had lawful access to this area because he was properly accompanying the Probation Officers on their home visit for purposes of officer safety. Once lawfully on defendant's property, Sgt. Lloyd saw the butt of the gun from a lawful vantage point outside of the passenger door of defendant's car, and confirmed its presence after walking to the driver's side of the car. As the Supreme Court noted in Arizona v. Hicks, 480 U.S. 321 (1987), an inspection "that involves merely looking at what is already exposed to view, without disturbing it – is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." Id. at 328; see also United States v. Rodgers, 924 F.2d 219, 221 (11th Cir. 1991).

Thus, because Sgt. Lloyd observed the gun in plain view from a lawful vantage point, he could properly seize it. The incriminating nature of the gun – as

a weapon, located very near the seat defendant had occupied – was readily apparent.   Mr. Ward, a convicted felon on probation, was prohibited from possessing a firearm.  See, e.g., United States v. Folk, 754 F. 3d 905, 914 (11th Cir. 2014) (holding that "[a] firearm that reasonably appears to be in the possession of a convicted felon qualifies as contraband—and is therefore subject to seizure under the plain view doctrine.")  Sgt. Lloyd was justified in reasonably believing that the gun belonged to Mr. Ward, as he observed it on the floorboard of the driver's side where Mr. Ward had been sitting when officers arrived.  Thus, the seizure of Mr. Ward's gun without a warrant did not violate the Fourth Amendment.   Accordingly, that seizure could not taint defendant's subsequent arrest.

### 2.   Mr. Ward's Custodial Statements Should Not be Suppressed

Mr. Ward further argues for the suppression of all statements he made to officers during custodial interrogation after his arrest.  Defendant first argues that the Government has not shown that his statements were made voluntarily and that they comported with the requirements of Miranda.  (Def.'s Mot. Suppress Evid. [10] ¶¶ 13-14.)  He then argues that those statements should be suppressed for the separate reason that they improperly stemmed from the earlier alleged Fourth Amendment violations relating to seizure of the gun.  (Id.)

19

In <u>Miranda v. Arizona</u>, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."  384 U.S. at 478.  Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege.  <u>Id.</u> at 478-79.  These so-called <u>Miranda</u> warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation."  <u>Endress v. Dugger</u>, 880 F.2d 1244, 1248 (11th Cir. 1989).

It is undisputed that Mr. Ward was given a full <u>Miranda</u> warning, after which he waived his rights.  There are no facts in the record suggesting that officers threatened Mr. Ward or promised him anything in return for waiving his <u>Miranda</u> rights, and at least two of the present officers testified that they did not have their weapons drawn. Moreover, as discussed <u>supra</u> Part III.A.1, the actions of the officers at Mr. Ward's residence were valid, and could not have tainted defendant's statements.  Thus, defendant's <u>Miranda</u> waiver was valid and his statements should not be suppressed.

**B.    Defendant's Motion to Suppress Evidence Obtained by Search Warrant Not Supported by Probable Cause and Prompted by the Unlawful Stop and Search of an Automobile**

Mr. Ward argues that the evidence obtained in his home and car should be suppressed because that evidence was prompted by earlier Fourth Amendment violations, and because the warrant was not supported by probable cause.  (See generally Def.'s Mot. Suppress Evid. [11].)  Defendant argues that he is entitled to a hearing regarding the sufficiency of the warrant's supporting affidavit under Franks v. Delaware, 438 U.S. 154 (1978), because officers intentionally omitted material information in that affidavit.  (Id.)  The Government responds that Mr. Ward has failed to make a sufficient argument that he is entitled to a Franks hearing, and that the question of whether the search warrant was based on an earlier Fourth Amendment violation is not yet ripe.  (Gov't Prelim. Resp.)

For the reasons set forth supra Part III.A, officers lawfully entered Mr. Ward's property based on his conditions of probation and there was no Fourth Amendment violation in the seizure of the gun, defendant's arrest, or the custodial statements.  Thus, defendant's argument that the search warrant is the fruit of an unlawful stop and search of Mr. Ward's car, and his seizure and arrest, is both ripe, and unavailing.  Because the decision to obtain a search warrant was not prompted by Fourth Amendment violations, suppression is not required on

21

that ground.   Accordingly, the officers' use of that evidence in the warrant affidavit is permissible.

The undersigned next considers whether, considering all the facts listed in the affidavit, there was probable cause for the issuance of a warrant and whether defendant is entitled to a <u>Franks</u> hearing based on alleged material omissions.

### 1.      The Warrant's Supporting Affidavit Was Sufficient

The Fourth Amendment dictates that probable cause must exist for a warrant to issue.   The Supreme Court defines "probable cause" as a "fair probability that contraband or evidence of a crime will be found in a particular place."   <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).   The determination of whether probable cause exists must be made in light of the "totality of the circumstances."   <u>Id.</u>  To satisfy this standard, the Government "must reveal facts that make it likely that the items being sought are in that place when the warrant issues."   <u>United States v. Domme</u>, 753 F.2d 950, 953 (11th Cir. 1985), <u>modified on other grounds</u>, <u>United States v. Dennis</u>, 786 F.2d 1029 (11th Cir. 1986).

A search warrant must be supported by a sworn affidavit containing information that "is believed or appropriately accepted by the affiant as true." <u>Franks v. Delaware</u>, 438 U.S. 154, 165 (1978).   The magistrate must make a practical, common-sense decision whether, given all the circumstances set forth

22

in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  <u>Gates</u>, 462 U.S. at 238.  "Probable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  <u>Id.</u> at 241 (quoting <u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1949)).  Moreover,

> [c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.

<u>United States v. Miller</u>, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing <u>Gates</u>, 462 U.S. at 236-37).  "[S]o long as the magistrate had a 'substantial basis . . . for conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more."  <u>Gates</u>, 462 U.S. at 236 (alteration in original) (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960), <u>overruled on other grounds by</u> <u>United States v. Salvucci</u>, 448 U.S. 83 (1980)).

As noted <u>supra</u> Part I.H, in support of a probable cause finding, the affidavit, prepared by Agent Wright, described the officers' visit to Mr. Ward's residence, their interactions with Mr. Ward, Mr. Gates, and Ms. Meeks, and their

23

discovery of the gun "with a loaded magazine with one round in the chamber" in Mr. Ward's car.  (Def.'s Ex. 1, at 3-4.)  Based on those facts, the state magistrate had a substantial basis for finding that probable cause existed.

Agent Wright's affidavit reflects that officers observed Mr. Ward seated in the driver's seat of a car when they arrived at his home.  After asking him to step out of the car, they found a loaded gun in the floorboard area of the driver's seat of that car.  Additionally, officers learned from Ms. Meeks that Mr. Ward had just exited his home before getting into the car.  Mr. Ward, a convicted felon, was not permitted to have any firearms in his possession.  The facts listed in the affidavit show that it was reasonable for the state magistrate to conclude that, given all the circumstances, there was a fair probability that additional contraband or evidence of crime, specifically additional guns or associated ammunition, would be found in defendant's home and/or car.  It is probable that these areas were places where Mr. Ward stored his contraband on the date of the officers' visit described in the affidavit, August 11, 2014.  Therefore, probable cause existed to search those areas on that date.

## 2.     Defendant is Not Entitled to a <u>Franks</u> Hearing

In <u>Franks</u>, the Supreme Court held that there is a "presumption of validity with respect to the affidavit supporting the search warrant."  438 U.S. at 171.

24

Under Franks, a defendant may challenge an affidavit in support of a search warrant "if he makes a 'substantial preliminary showing' both that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to a finding of probable cause."  United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (citing Franks, 438 U.S. at 155-56); see also United States v. Valencia-Trujillo, 573 F.3d 1171, 1182 (11th Cir. 2009) (quoting Franks, 438 U.S. at 155-56).  If a defendant satisfies both prongs, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search.  Arbolaez, 450 F.3d at 1293.

The Eleventh Circuit has noted that the substantiality requirement is not lightly met.  See id. at 1294 (finding no "substantial preliminary showing" where "[t]here [was] no affidavit or otherwise sworn statement.").  Thus, to mandate an evidentiary hearing,

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

25

<u>Franks</u>, 438 U.S. at 171.  "[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause."  <u>United States v. Kapordelis</u>, 569 F.3d 1291, 1309 (11th Cir. 2009) (citing <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1327 (11th Cir. 1997)).

When assessing whether alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading.  <u>Kapordelis</u>, 569 F.3d at 1309.  Then, looking only at the remaining portions of the affidavit, the court must determine whether including the omitted facts would have prevented a finding of probable cause.  <u>Id.</u>  Defendant bears the burden of showing that, "absent those misrepresentations or omissions, probable cause would have been lacking."  <u>Id.</u> (citing <u>United States v. Novaton</u>, 271 F.3d 968, 987 (11th Cir. 2001)).  "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  <u>Franks</u>, 438 U.S. at 172.

Here, Mr. Ward fails to meet his burden of making a substantial preliminary showing that any allegedly material omissions impacted the probable cause determination.  Defendant asserts only that Agent Wright omitted a

26

material fact by failing to include in the affidavit a statement made by Ms. Meeks that "she never saw Mr. Ward with the firearm" and that the vehicle, and residence, were owned by Mr. Ward's father, rather than Mr. Ward himself.  He fails to assert that these omissions were made intentionally, or with a reckless disregard for the truth. Moreover, as the Government observes, Ms. Meeks did not state that she never saw Mr. Ward with the firearm; rather, she stated that she did not see anyone with the gun.  (Def.'s Ex. 1, at 2.)

Additionally, as discussed <u>supra</u> Part III.B.1, the magistrate properly found probable cause to issue the warrant without either of the allegations; thus, neither is necessary to the finding of probable cause.  The fact that the house and car were owned by Mr. Ward's father does not change the fact that defendant had access to both (as evidenced by the affidavit's description of his recent exit from the home, and that he was in the car when officers arrived).  Moreover, that Ms. Meeks did not see Mr. Ward with the firearm is insufficient to contest the fact that it was found very near where defendant had been sitting when officers arrived.  Thus, the facts are not sufficiently material to alter the magistrate's probable cause decision, and Mr. Ward has failed to meet his burden. Accordingly, defendant is not entitled to a <u>Franks</u> hearing.

27

## IV.   <u>CONCLUSION</u>

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's "Motion to Suppress Evidence Seized from Automobile and Custodial Statements" [10] and "Motion to Suppress Evidence Obtained by Search Warrant Not Supported by Probable Cause and Prompted by the Unlawful Stop and Search of an Automobile" [11] be **DENIED**.

**SO RECOMMENDED**, this 24th day of June, 2016.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE